**Robert Onesimo LOVATO,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 94–297.**

Supreme Court of Wyoming.

Aug. 30, 1995.

Sylvia Lee Hackl, State Public Defender; and Deborah Cornia, Appellate Counsel, Cheyenne, for appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Sr. Assistant Attorney General; and Cal Rerucha, Special Assistant Attorney General, Cheyenne, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

GOLDEN, Chief Justice.

Robert Onesimo Lovato contends there is not sufficient evidence to sustain his conviction for first degree murder.

We affirm.

Lovato insists the evidence is insufficient to sustain the jury's verdict of guilty of first

degree murder because the record lacks proof he premeditated the crime or that he committed it with the requisite malice.[1] In response, the state maintains there is ample evidence from which the jury could infer the murder was committed with malice and premeditation.

■ We have articulated a standard for reviewing the sufficiency of evidence in first degree murder cases, with special attention to the distinction between first and second degree murder. Our standard of review is not whether the evidence is sufficient for us, but whether, when viewed favorably to the state, it was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt. *Bouwkamp v. State,* 833 P.2d 486, 493, 496 (Wyo.1992); and *see Young v. State,* 849 P.2d 754, 762 (Wyo.1993). The analytical framework is:

Evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories: (1) facts about * * * what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3) would * * * support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed'; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take [the] victim's life in a particular

way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."

*Bouwkamp,* 833 P.2d at 494–95 (*quoting People v. Crandell,* 46 Cal.3d 833, 760 P.2d 423, 441, 251 Cal.Rptr. 227, 244 (1988)); *also see Geiger v. State,* 859 P.2d 665, 669–70 (Wyo. 1993); *Young,* 849 P.2d at 759–763.

■ Viewed in a light most favorable to the state, the evidence shows Lovato intensely disliked the victim, John Candelaria.[2] On the day Lovato committed the murder, he was carrying a gun which he acquired some substantial time before the crime. The gun's serial numbers had been defaced and were unreadable. The gun was loaded and the record indicates Lovato routinely carried that gun.

About 8 p.m. on May 3, 1994, Lovato, who was in Laramie to help a friend move out of a college dormitory, ran into Candelaria on the University of Wyoming campus. Using profanity, Lovato precipitated a fist-fight. An eyewitness described this series of events: As the witness approached the corner of 15th Street and Ivinson, he saw a fight, "they were like two alley cats, really getting after it." To the witness, it appeared Candelaria was backing away from the fight with his hands up, signifying he had had enough. A second individual appeared to be joining Lovato in a continued attack upon Candelaria and so the witness decided he was going to try to stop the fight because he thought two against one wasn't a fair fight. In the blink of an eye, as recounted by the eyewitness, Lovato's coat opened and he pulled out a pistol and fired two rounds into Candelaria's torso and face. Candelaria immediately fell to his knees with one hand up in the air to defend himself from the fusillade. Based on the witness's experience of having been in combat, Candelaria appeared to be mortally wounded. That witness was close enough to

1. The jury was instructed that two of the elements of first degree murder are that the crime was committed (1) with premeditation and (2) with malice. Wyo.Stat. § 6–2–101(a) (Supp. 1995).

2. The record does not explain with any precision the cause of the "bad blood" between Candelaria and Lovato. It is suggested Candelaria believed

Lovato stole a car stereo from him. A witness testified Candelaria told her to tell Lovato he was going "kick his ass." The witness indicated she relayed that message to Lovato. There was no evidence Candelaria had ever acted on his threat and certainly no evidence Candelaria played any role whatever in precipitating the fight which resulted in his murder.

see Candelaria's eyes roll back into his head. A friend of Lovato's appeared to try to restrain Lovato, screaming "My God, my God, Bobby, what have you done," but Lovato brushed him away and fired again. The witness described the look of rage which showed on Lovato's face. As the witness turned to run for help, he heard yet another shot, but did not turn back to see it.

Another eyewitness also saw the fight and, while the two fighters were separated by a distance of five or six feet, she saw Lovato pull out a gun and fire several rounds at Candelaria. After the first volley of shots, she described Candelaria as being down on his knees and motionless. Continuing, the witness described the second volley of shots:

> I remember the shooter came like, came around, and he seemed to, like, be behind him, have him in a headlock, and then he fired twice more.

Several other eyewitnesses confirmed the testimony of the witnesses who were closest to the scene of the murder. The synopsis set out above captures the essence of the horrifying scene played out on the campus of the University of Wyoming that fateful day. We add to these facts that, at the time of this occurrence, Candelaria was carrying a notebook, a pen and a pencil. After killing Candelaria, Lovato immediately fled the scene in a waiting automobile, with the goal of getting out of town, taking the murder weapon somewhere and "ditching it." He was apprehended by law enforcement officials within minutes of the murder and the murder weapon was retrieved from Lovato's pants pocket.

Evaluating this evidence in conformity with the conceptual framework identified above, we hold there is evidence from which a jury might infer Lovato planned to confront Candelaria, engage him in a fight and then, based upon self-defense, claim he had to shoot Candelaria. There is not a shred of credible evidence to suggest Lovato shot Candelaria in self-defense, though the jury was instructed it could consider that de-

fense.[3] While the evidence is not strong in this regard, we conclude a jury of reasonable persons might make such an inference. *Collins v. State*, 589 P.2d 1283, 1292 (Wyo.1979) (defendant habitually carried a firearm and had made up his mind to use it in just the circumstances that developed; much of the premeditation had been formed before the immediate occasion and it took but a moment to fully trigger the intent to kill); *see also People v. Morris*, 46 Cal.3d 1, 249 Cal.Rptr. 119, 132, 756 P.2d 843, 856 (1988), *overruled on other grounds by In re Sassounian*, 9 Cal. 4th 535, 37 Cal.Rptr.2d 446, 887 P.2d 527 (1993); *People v. Miranda*, 44 Cal.3d 57, 241 Cal.Rptr. 594, 611–13, 744 P.2d 1127, 1144–45 (1987), *cert. denied*, 486 U.S. 1038, 108 S.Ct. 2026, 100 L.Ed.2d 613 (1988); *People v. Bloyd*, 45 Cal.3d 333, 233 Cal.Rptr. 368, 375, 729 P.2d 802, 810 (1987).

There is evidence from which a jury might infer Lovato had a motive to kill Candelaria. He had expressed an earnest antipathy toward Candelaria and communicated that dislike in circumstances where he was armed and showing off his ability to administer ultimate retribution.

The murder took place in an exacting manner, from which the jury could infer it was premeditated. Lovato fired a volley of shots from a point of relative safety, then fired more shots into Candelaria's mortally wounded body, and then, gangland style, he fired another shot or two, at point blank range, into Candelaria's head.

Lovato contends there is insufficient evidence of malice. Malice may be inferred from the use of a gun. *Collins*, 589 P.2d at 1292. The evidence is sufficient to sustain the jury's finding that Lovato acted with malice.

In summary, we hold the evidence is sufficient from which the jury could infer that Lovato acted with premeditation and with malice. *Bouwkamp*, 833 P.2d at 493–95; *Collins*, 589 P.2d at 1292; and *see People v. Wright*, 39 Cal.3d 576, 217 Cal.Rptr. 212,

---

**3.** We do not mean to suggest the district court acted improperly in giving that instruction because there was some slight evidence to that point and that was the thrust of Lovato's defense. However, it lacked any semblance of credibility and it is not surprising the jury rejected it out of hand.

222–24, 703 P.2d 1106, 1116–17 (1985); and *see generally* LEE R. RUSS, ANNOTATION, *Modern Status of the Rules Requiring Malice "Aforethought," "Deliberation," or "Premeditation," as Elements of Murder in the First Degree*, 18 A.L.R. 4th 961 (1982).

We affirm Lovato's conviction for first degree murder.