# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 44

APRIL TERM, A.D. 2016

April 15, 2016

JAMES DARYL EMERSON,

Appellant
(Defendant),

v.                                                                S-15-0056, S-15-0223

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
*The Honorable Daniel L. Forgey, Judge*

**Representing Appellant:**

> *Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel. Argument by Ms. Olson.*

**Representing Appellee:**

> *Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Marc L. Smith, Special Assistant Attorney General. Argument by Mr. Smith.*

**Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.**

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Chief Justice.**

[¶1]    Appellant, James Daryl Emerson, challenges the district court's denial of his motion for a new trial.  We affirm.

## *ISSUE*

[¶2]    Appellant presents one issue:

> Did the trial court abuse its discretion in denying Appellant's motion for a new trial?

## *FACTS*

[¶3]    On the evening of March 19, 2014, Appellant was at his nephew Samson's residence drinking with Samson, Alisha Ayers, and Jeremy Cantleberry.  At some point, Appellant and Mr. Cantleberry got into a heated argument.  Samson told everyone to leave and, in response, Appellant began yelling at Samson.  Ultimately, Appellant left the residence and walked down the street to his home, which he shared with Mr. Cantleberry.

[¶4]    Subsequently, Samson discovered that Appellant had forgotten his cell phone.  He took the phone to Appellant's residence.  After leaving the phone outside Appellant's trailer, Samson headed home.  During that return trip, Samson was accosted by Appellant, who grabbed Samson and held a knife to his throat.  During the ensuing struggle, Appellant cut Samson's cheek with the knife.  Appellant then tackled Samson and held him on the ground for several minutes before releasing him.

[¶5]    Samson then walked to his grandmother's house, and asked her to take him to the hospital.  At the hospital, Samson told law enforcement that Appellant had attacked him and recited the events as described above.  Law enforcement also interviewed Ms. Ayers, who was a witness to the assault, and Mr. Cantleberry.  Both Ms. Ayers and Mr. Cantleberry corroborated Samson's account of the altercation.

[¶6]    On the day following the assault, detectives from the Casper Police Department interviewed Appellant about the events of the previous night.  Appellant claimed he had been in an altercation with an "unknown male" but stated that he was very intoxicated and did not remember anything about the altercation.  The detectives observed that Appellant had blood on his pants and shirt.  After Appellant was taken to jail, law enforcement officers executed a search warrant for Appellant's home and found a black knife with "Joker" engraved on one side of the blade and "Why so serious" on the other.

[¶7]    On March 21, the State charged Appellant with aggravated assault and battery, in violation of Wyo. Stat. Ann. § 6-2-502(a)(ii).  At trial, Appellant claimed he had acted in

1

self-defense. Samson testified to the same version of events as recorded in his interview at the hospital on the night of the assault. Ms. Ayers also gave testimony consistent with her statements to police after the assault. She stated that she saw Appellant grab Samson by the neck and that Samson was unarmed. Additionally, Mr. Cantleberry, consistent with his statements during investigation of the assault, testified that Appellant was highly agitated before the assault, and that he observed a gash on Samson's cheek after the assault. The State also introduced evidence showing that the knife found at Appellant's home had Samson's dried blood on it. After a three-day trial, the jury found Appellant guilty of aggravated assault and battery.

[¶8] Ten months after his conviction, Appellant filed a motion for a new trial based on statements made by Stanley Powley, whom Appellant had met in jail, and Mr. Powley's ex-girlfriend, Katie McNaughton. The couple had moved into Samson's residence after Appellant was charged but before trial. According to Appellant's motion, Mr. Powley claimed that Samson had told Mr. Powley "that he had to talk to Ayers and Cantleberry to make sure they all had their stories straight for the trial."

[¶9] The district court held a hearing on the motion. During the hearing, Mr. Powley testified that "I just remember [Samson] stating that [Samson], [Mr. Cantleberry], and [Ms. Ayers] had to get together to make sure that what they were saying was straight or whatever. That's about it." Ms. McNaughton testified that "The conversations were about, like, . . . Well, I think you should say this; and instead of saying that, we should say this instead, so that all of our stories go together, and stuff like that." Following the hearing, the district court denied the motion.

[¶10] Appellant appealed from the denial of his motion for a new trial in August 2015. At that time, Appellant's direct appeal from his conviction was pending. We granted Appellant's motion to stay briefing in his direct appeal and ordered the two appeals to be consolidated for argument and decision. Appellant raises the same issue in both appeals.

## DISCUSSION

[¶11] New trials in criminal cases are allowed if "required in the interest of justice." W.R.Cr.P. 33(a). We generally review the district court's decision on a motion for a new trial for abuse of discretion. *Mendoza v. State*, 2013 WY 55, ¶ 8, 300 P.3d 487, 489 (Wyo. 2013); *Hicks v. State*, 2008 WY 83, ¶ 30, 187 P.3d 877, 883 (Wyo. 2008). A district court abuses its discretion when it could not have reasonably concluded as it did. *Mendoza*, ¶ 8, 300 P.3d at 489.

> In determining whether there has been an abuse of discretion, we focus on the "reasonableness of the choice made by the trial court." *Vaughn* [*v. State*], 962 P.2d 149, 151 (Wyo. 1998). If the trial court could reasonably conclude as it did

2

and the ruling is one based on sound judgment with regard to what is right under the circumstances, it will not be disturbed absent a showing that some facet of the ruling is arbitrary or capricious.

*Miller v. Beyer*, 2014 WY 84, ¶ 14, 329 P.3d 956, 961 (Wyo. 2014) (quoting *Dollarhide v. Bancroft*, 2010 WY 126, ¶ 4, 239 P.3d 1168, 1170 (Wyo. 2010)).

[¶12]   A defendant who seeks a new trial based on newly discovered evidence typically must demonstrate the following:  (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted; and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial.  *Davis v. State*, 2005 WY 93, ¶ 45, 117 P.3d 454, 471 (Wyo. 2005) (citing *Opie v. State*, 422 P.2d 84, 85 (Wyo. 1967)).  A motion for a new trial on the grounds of newly discovered evidence is not favored by the courts and is viewed with great caution.  *Terry v. State*, 2002 WY 162, ¶ 10, 56 P.3d 636, 639 (Wyo. 2002) (citing *Griswold v. State*, 2001 WY 14, ¶ 8, 17 P.3d 728, 731 (Wyo. 2001)).  All four factors must be met for entitlement to a new trial and, if any one factor is not satisfied, there is no error in the denial of the new trial motion.  *Terry*, ¶ 10, 56 P.3d at 639.

[¶13]   Following the hearing on Appellant's motion for a new trial, the district court concluded that Appellant had not demonstrated that the testimony of Mr. Powley and Ms. McNaughton was so material that it would probably produce a different verdict if a new trial was granted.  The court determined that both of the witnesses lacked credibility. The court further determined that the evidence constituted impeachment evidence and that, under this Court's precedent, such evidence does not provide proper grounds for granting a new trial.

[¶14]   Appellant claims the district court abused its discretion in denying his motion for a new trial.  He contends the case against him was "based entirely upon the testimony of the three witnesses of whom Mr. Powley and Ms. McNaughton had knowledge." According to Appellant, the testimony of Mr. Powley and Ms. McNaughton would have produced a different verdict if a new trial had been granted.  We do not agree.

[¶15]   Neither Mr. Powley nor Ms. McNaughton could recall specifics of the alleged conversations between Samson, Mr. Cantleberry, and Ms. Ayers, or that any of them had agreed not to give truthful testimony.   Mr. Powley testified as follows on direct examination:

> DEFENSE COUNSEL:  Do you recall any specifics of them talking about [the charges against Appellant]?

WITNESS: No; just kind of the – what happened. There was an altercation and Sam ended up getting cut; and not much on, like, actual what happened and whatnot. So –

DEFENSE: And you've told me your memory of that time isn't necessarily the best; is that a fair statement?

WITNESS: Yes, it is; very fair.

DEFENSE: But you did give me an affidavit, but – because you did recall a specific conversation that you had with Sam Emerson?

WITNESS: Yes.

DEFENSE: And can you just tell us what you remember about that conversation?

WITNESS: I just remember him stating that [Samson], [Mr. Cantleberry] and [Ms. Ayers] had to get together to make sure that what they were saying was straight or whatever. That's about it.

DEFENSE: And do you know that they got together and talked about their testimony?

WITNESS: I remember; but like I said, I was coming and going, and I don't quite remember if they had all got together, if they had talked separately, or what. I don't know.

. . .

DEFENSE: Do you remember anything else at all about what Samson Emerson said or any of the details?

WITNESS: Not really. I can't – I can't say for sure anything that he said, because I could be lying at that point. So –

Indeed, Mr. Powley testified that he was not sure that a conversation about the trial took place:

4

PROSECUTION: And you were never present when this conversation occurred; correct?

WITNESS: Not that I can recall.

PROSECUTION: So you don't know if it occurred or didn't occur?

WITNESS: Yes.

PROSECUTION: And you don't know, if it did occur, what was said –

WITNESS: Yes.

PROSECUTION: – correct?

WITNESS: Exactly.

[¶16] Similarly, Ms. McNaughton did not testify that any of the witnesses had agreed to give untruthful testimony. She stated that "The conversations were about, like, . . . [']Well, I think you should say this; and instead of saying that, we should say this instead, so that all of our stories go together,['] and stuff like that." On cross-examination, however, she stated that "I don't believe [Samson] told anyone to change their stories. I think it was more like he was coercing them or saying it would be better if you said it this way or that way; not completely, [']Hey, don't say that, say this[.']"

[¶17] Further, the testimony of Mr. Powley and Ms. McNaughton was undermined by their inability to give a precise account of the alleged conversations between Samson, Mr. Cantleberry, and Ms. Ayers, as well as their admissions of drug use during the relevant period. Both Mr. Powley and Ms. McNaughton testified that "everyone in the house," themselves included, was using methamphetamine during the time they resided at Samson's house, and that their drug use inhibited their ability to perceive and remember the events in question. Additionally, Ms. McNaughton stated that she could tell when people are lying because she was an experienced liar herself: "I've kind of been a liar my whole life. You know, I've lied a lot in my life. And I'm a girl. So you can kind of tell when people are bullshitting." With respect to the issue of witness credibility, the district court concluded as follows:

I find that there are some apparent credibility issues with the testimony of the witnesses Powley and McNaughton that, in my mind, affects the weight of that testimony in

5

evaluating whether the testimony would probably have produced an acquittal if a new trial were granted.

As far as Mr. Powley, I would note that he testified that he did not have a good memory or recollection. He testified that he was using methamphetamine during the relevant time period and was not thinking straight. He also did not have much recollection of the specifics other than Samson had – Emerson talking with others about getting their story straight.

As far as Ms. McNaughton, she testified that she was under the influence of drugs, as well, during the relevant time period, including Spice and methamphetamine. There obviously is a lot of hearsay that was testified to relating to the basis for what she had to testify to. I would note that in Exhibit A, which was a recitation of her statements to the detective that the Court had previously received, she was equivocal. Her statements and testimony differ from Mr. Powley's statements and testimony. There are also differences between her statement to the detective and her testimony in court. And perhaps most glaringly, she volunteered during her testimony that she's essentially been a liar her whole life and has lied to a lot of different people.

We defer to the district court's assessment of witness credibility. *Allgier v. State*, 2015 WY 137, ¶ 22, 358 P.3d 1271, 1278 (Wyo. 2015).

[¶18] Finally, considering that the testimony of Mr. Powley and Ms. McNaughton did not indicate that Samson, Mr. Cantleberry, or Ms. Ayers planned to testify falsely at trial, we agree with the district court's determination that the evidence could only have been used in an attempt to impeach the witnesses. As noted by the district court, we have held that a motion for a new trial on the grounds of newly discovered evidence shall not be granted where the evidence is solely to impeach a witness:

As recognized and admitted by Terry, this court has long established that a motion for new trial on the grounds of newly discovered evidence shall not be granted where the evidence is solely to impeach a witness.

The newly discovered evidence must be more than impeaching or cumulative; it must be material to the issues involved; it must be such as would probably

6

produce an acquittal; and a new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at trial.

*Terry*, ¶ 19, 56 P.3d at 642 (internal citation omitted).

[¶19]   Appellant contends this case is analogous to *Keser v. State*, 737 P.2d 756 (Wyo. 1987), where the Court reversed the denial of a motion for a new trial when the newly discovered evidence suggested that an eyewitness was not at the scene of the crime. This Court found that the evidence was not merely relevant for impeachment purposes:

> There is a difference between evidence which merely goes to credibility or impeaches a witness by calling his credibility into question and evidence which is offered to show an "eyewitness" to a crime gave false identification testimony. The evidence offered by appellant in this case was impeaching; it also falls into the latter category, as it was offered to show that Allan Franklin, the only witness who claimed to see defendant commit the crime, was not present at the scene of the crime. Unlike the impeachment evidence offered in *Grable v. State*[, 664 P.2d 531 (Wyo. 1983)] and *Salaz v. State*, [561 P.2d 238 (Wyo. 1977)] this evidence is so material that it would probably produce a different verdict. Thus, the district court was not correct in ruling that appellant's motion and affidavits failed to support any ground upon which a new trial may be granted.

*Keser*, 737 P.2d at 760. According to Appellant, the newly discovered evidence in this case "was not useful solely to impeach, but instead, was material to the issue of whether the eyewitnesses to the crime were giving false testimony, just as in *Keser*." As indicated above, however, Mr. Powley and Ms. McNaughton did not testify to any facts that were different from the factual account provided by the witnesses at trial. Unlike *Keser*, the newly discovered testimony in the present case did not allege that the trial witnesses had testified falsely.

[¶20]   In sum, neither Mr. Powley nor Ms. McNaughton could state that any of the witnesses had conspired to give untruthful testimony. The district court correctly determined that their testimony could only have been used as impeachment evidence. Further, the district court determined that Mr. Powley's and Ms. McNaughton's credibility was undermined by their inability to provide a precise account of the alleged conversations between Samson, Mr. Cantleberry, and Ms. Ayers, as well as their admissions of drug use during the period in question. We defer to that assessment.

7

Accordingly, for the reasons set forth above, we find no abuse of discretion in the district court's decision denying Appellant's motion for a new trial.

[¶21]  Affirmed.