# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 108

OCTOBER TERM, A.D. 2016

November 16, 2016

CLINT D. WATKINS,

Appellant
(Defendant),

v.

S-16-0060

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Uinta County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
> *Office of the State Public Defender:  Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Patricia L. Bennett, Senior Assistant Appellate Counsel.*

*Representing Appellee:*
> *Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Kellsie Jo Singleton, Assistant Attorney General.*

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Chief Justice.**

[¶1]   Appellant, Clint D. Watkins, was convicted of two counts of first-degree sexual abuse of a minor.  On appeal, he claims that prosecutorial misconduct deprived him of a fair trial.  We conclude there was no misconduct, and affirm.

### *ISSUE*

[¶2]   The sole issue presented by Appellant is whether the prosecutor committed prosecutorial misconduct during rebuttal argument, impermissibly invading the province of the jury.

### *FACTS*

[¶3]   Appellant was charged with two counts of sexual abuse of a minor in the first degree, in violation of Wyo. Stat. Ann. § 6-2-314(a)(ii) (LexisNexis 2013).   The information alleged that, in the winter of 2013, Appellant twice inflicted sexual intrusion on his daughter, CW.  At the time, CW was fourteen years old and living with Appellant, his wife, and their son.

[¶4]   At the age of fifteen, CW left Appellant's house to move in with her aunt and uncle, who later adopted her.  Her aunt put CW into counseling because she was depressed and suffered from panic attacks.  In February of 2015, a couple of days after her first counseling session, CW reported to her aunt that she had been sexually abused by Appellant.  Her aunt reported the incidents to law enforcement officials, leading to the charges against Appellant.

[¶5]   During opening statement, defense counsel laid out Appellant's theory of the case.  He asserted that the evidence would demonstrate a "difficult" relationship between CW and Appellant.  CW did not like living with Appellant and his wife.  In early 2014, CW had an opportunity to participate in a school trip to Costa Rica.  Appellant could not afford to pay for the trip, but Appellant's sister and her husband, CW's aunt and uncle, were willing to pay CW for doing chores so that she could afford the trip.  CW began spending more time with her aunt and uncle and, eventually, to relieve the "ongoing strife" between CW and Appellant, the aunt and uncle arranged for CW to live with them.  Near the middle of 2014, Appellant relinquished his parental rights to CW, and the aunt and uncle adopted her.  Following the adoption, Appellant decided not to allow CW to spend time with her little brother, which made her angry.  Defense counsel concluded:

> But there was one factor that [CW] was not counting
> on in finding herself living with [her aunt and uncle], in a
> more affluent situation, a situation where she wasn't going to
> have to work to earn the money to go to Costa Rica.   She

1

wasn't going to have to comply with the rules that her father had been imposing on her. . . . [However, because] of the nature of this confrontation, [Appellant and his wife] decide that [her brother] shouldn't be spending any time with [CW]. . . . But [CW] hadn't counted on not seeing her little brother, someone that she dearly loves. . . . From that, we submit to you that she has made up a story that has brought all of us here today. My client, [Appellant], never sexually abused his daughter.

[¶6]    On direct examination, CW provided detailed testimony concerning the two incidents. It is unnecessary to review those details in this opinion. We merely observe that, if the jury believed CW's testimony, there was sufficient evidence to find Appellant guilty of the two charges.

[¶7]    On cross-examination, defense counsel questioned CW about her anger toward Appellant and some of the reasons for it. CW agreed that she "had a hard time" living with Appellant. Appellant was "very demanding" and gave her chores that she did not like to do. While Appellant did not pay CW for doing her chores, her aunt and uncle did and, eventually, they paid for her trip to Costa Rica. She testified that her aunt and uncle were wealthier than Appellant and his wife, and that living with them was comfortable and easier for her. She admitted that it was "very frustrating" when Appellant would not let her see her little brother, and that it felt like Appellant had "taken the most important person in the world away" from her. In response to defense counsel's questioning, CW admitted that she "particularly hated" it when Appellant reminded her that her mother had committed suicide by overdosing on drugs.

[¶8]    CW's aunt corroborated CW's testimony that she did chores at the aunt's home. The aunt also confirmed that they had paid CW for doing some chores in order to help her pay for the school trip to Costa Rica. When asked about the life-style she and her husband lived, CW's aunt described it as "average" and "pretty boring, really."

[¶9]    In closing argument, defense counsel reiterated the theme that CW lied about the sexual abuse because she was angry:

When one looks at the total sum of the facts and evidence in this case, what we see is a very, very angry girl. A girl who is angry at the world because her mother committed suicide; is angry at [Appellant] because he reminded her of that. . . . She was now having to live with [Appellant] in circumstances she didn't like. She had to do chores. . . . And she fought with him relentlessly. And then she saw an opportunity to, perhaps, change her circumstances,

2

she did so. She pushed to go live at her aunt's home; and she did that without appreciating the consequences. . . . And because she was angry, in February, 2015, when she was so frustrated for having not seen her little brother and so mad, she vented that anger by making an accusation that's unfounded, that's unsubstantiated, and that just does not make sense . . . . I submit to you, when you think about this in the light of human experience and the course of common sense and look at the facts in this case, you're going to find this little girl is angry, vindictive, and lying.

[¶10]  In rebuttal, the prosecutor responded to defense counsel's argument:

[PROSECUTOR]:  So as [defense counsel] identified, this truly is a situation where it's a question of credibility.  It comes down to one question:  Do you believe [CW]? . . .

If someone says during your deliberations, "[CW] wanted an extravagant life-style.  This is all a story so she could live with a more affluent home," then think about the testimony and respond in relation to issues that [CW's aunt] identified. [She] identified a very moderate life-style. . . .

If someone says to you that [CW] wanted to avoid these chores, you heard her testify that in [Appellant's] home, she was expected to sweep, vacuum, clean the bathrooms, clean her room, clean [her brother's] room, do the laundry.  She was expected to clean the entire house.  And she didn't necessarily always like that.  But if that is the assertion, then I challenge you to state but didn't she still do chores?  You heard [the aunt's] testimony.  She still has to help around the house. She still has to clean.  She still has to do those things. The only difference is now she gets recognized for it.  She's not working any less; she's just better parented. . . .

Finally, if someone during deliberations says –

[DEFENSE COUNSEL]:  I'm going to object, your Honor. She's invading the province of the Jury by discussing to the Jury how they should deliberate, not arguing the facts.

THE COURT:  Any response . . . ?

3

[PROSECUTOR]: Your Honor, closing arguments are argumentative. They certainly have the opportunity and knowledge. I am just going through the evidence to state how you can respond to inquiries and educate the Jury.

THE COURT: The Court will overrule your objection. The thing that the Court understands is that the arguments are responses to arguments brought up by the Defense. Go ahead and complete your closing.

[PROSECUTOR]: Thank you, your Honor. Counsel.

Finally, if someone were to say she just wants to see [her brother], that's why we're here, how – how does this get her to see her brother? What logical sense, what common sense does that make, that this proceeding would make it so that that would happen, that that problem would go away?

[¶11] After deliberation, the jury found Appellant guilty on both counts of sexual abuse of a minor in the first degree. He was sentenced to serve concurrent terms of fifteen to thirty-five years in prison. He filed this timely appeal.

## DISCUSSION

[¶12] Appellant claims that the prosecutor's argument quoted above constituted prosecutorial misconduct because it improperly invaded the province of the jury by "tell[ing] the jurors what to say to each other, what to think and how to deliberate." Appellant asserts that the jury is the sole trier of fact. Accordingly, he contends, it was improper for the prosecutor to tell the jury how it should deliberate.

[¶13] At trial, defense counsel objected to the prosecutor's rebuttal argument. The district court overruled the objection. We review the district court's decision using this standard of review:

> In reviewing a claim of prosecutorial misconduct in closing argument, the court looks at the entire record to determine whether the defendant's case was so prejudiced by the improper comments as to result in the denial of a fair trial. *Capshaw v. State*, 10 P.3d 560, 567 (Wyo. 2000); *Metzger v. State*, 4 P.3d 901, 910 (Wyo. 2000). The challenged comments are judged in the context of the prosecutor's entire argument, considering the context of the

4

statements and comparing them with the evidence produced at the trial. *Helm v. State*, 1 P.3d 635, 639 (Wyo. 2000).

. . . When an objection is launched to a statement made in closing argument, we defer to the trial court's ruling in the absence of a clear or patent abuse of discretion. *Gayler v. State*, 957 P.2d 855, 860 (Wyo. 1998).

*Budig v. State*, 2010 WY 1, ¶ 15, 222 P.3d 148, 154 (Wyo. 2010) (quoting *Harris v. State*, 2008 WY 23, ¶ 14, 177 P.3d 1166, 1170 (Wyo. 2008)). Even where we find prosecutorial misconduct, "reversal is not warranted unless a reasonable probability exists, absent the error, that an appellant may have enjoyed a more favorable verdict." *Sullivan v. State*, 2011 WY 46, ¶ 10, 247 P.3d 879, 881 (Wyo. 2011).

[¶14] We have long said that a prosecutor is afforded "[g]reat latitude" when arguing a case to the jury. *Armstrong v. State*, 826 P.2d 1106, 1115-16 (Wyo. 1992) (quoting *State v. Kennedy*, 162 W. Va. 244, 249 S.E.2d 188, 191 (W. Va. 1978)).

However, there are boundaries the prosecutor may not cross. In *Trujillo v. State*, 2002 WY 51, ¶ 5, 44 P.3d 22, 24-25 (Wyo. 2002), we quoted from and approved of the ABA Standards for Criminal Justice regarding argument to the jury:

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence [of] the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the

5

controlling law, or by making predictions of the consequences of the jury's verdict.

*Carroll v. State*, 2015 WY 87, ¶ 32, 352 P.3d 251, 259 (Wyo. 2015).

[¶15] Appellant does not contend that the prosecutor in this case violated any of these standards. Instead, he asserts that the prosecutor's comments invaded the province of the jury by telling them "what to think." However, the ABA Standards expressly provide that a prosecutor "may argue all reasonable inferences from evidence in the record." When a prosecutor asserts reasonable inferences from the evidence, he or she is naturally suggesting a way for the jury to think about the evidence. We reject Appellant's claims that the prosecutor's argument improperly told the jury what to think.

[¶16] In one instance, ("But if that is the assertion, then I challenge you to state but didn't she still do chores?"), the prosecutor did tell the jury what to say. When the argument is read in context, however, it is not properly interpreted as a literal instruction to the jury on what to say or how to behave in deliberation. It was a rhetorical device by which the prosecutor meant to suggest to the jury one reasonable interpretation of the evidence. As in *Wilks v. State*, 2002 WY 100, ¶ 32, 49 P.3d 975, 988 (Wyo. 2002), "[w]e conclude the prosecutor's statements were merely rhetorical and not improper; therefore, they did not amount to error." Appellant has failed to establish prosecutorial misconduct and we find no error in the district court's decision overruling Appellant's objection to the prosecutor's rebuttal argument.

[¶17] Affirmed.

6